UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| BRUCE COLEMAN, ) | |
| ) | |
| Plaintiff, ) | Civil No. 12-172-ART |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| MICHAEL J. ASTRUE, ) | **AND ORDER** |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

*** *** *** ***

The Commissioner of Social Security denied Bruce Coleman's application for disability insurance benefits and supplemental security income. Coleman now seeks judicial review of that decision. *See* 42 U.S.C. § 405(g). Because the decision denying benefits did not follow the "treating physician rule," the Court will remand the case back to the ALJ for specific findings consistent with this opinion.

## BACKGROUND

Bruce Coleman's life has been undeniably difficult. Coleman witnessed his parents' violent fights as a young child. R. 9-1 at 268 (Tr. at 264). At age thirteen, he watched his father die in a house fire. Though Coleman tried to rescue his father, some of his family members blame him for the death. He still feels guilty about the incident, experiences nightmares, and avoids open flames. *Id.* He has been diagnosed with post-traumatic stress disorder related to the incident. *Id.* at 267, 329 (Tr. at 263, 325). Coleman's mother was schizophrenic, and she committed suicide when he was sixteen. *Id.* at 269 (Tr. at 265). Like

his mother, Coleman is schizophrenic. *Id.* at 300 (Tr. at 296). Sometimes he hears her voice asking him to "join her," although he is not suicidal. *Id.* at 305 (Tr. at 301).

Coleman has done his best to cope with what life has thrown at him. He joined the Navy and served for six years as a boatswain's mate before being honorably discharged. *Id.* at 34–36 (Tr. at 30–32). Since then Coleman has held a series of kitchen and janitorial jobs. *Id.* at 205–213 (Tr. at 201–09). He has been married to his wife, Viola, for sixteen years. *Id.* at 37 (Tr. at 33). Their marriage is difficult, but he has stuck with it. Viola is also schizophrenic and often gets very angry with and insults Coleman. *Id.* at 37, 48 (Tr. at 33, 44). Viola's disability benefits are the family's only income, and her family faults Coleman for not doing more to support her. *Id.* at 266 (Tr. at 262). For all these reasons, Coleman's self-esteem is very low. *Id.* at 302 (Tr. at 298). Coleman and his wife recently had their first child, Bishop. Most parents find the child-rearing process stressful and daunting, but for Coleman it appears to have been a tipping point. The constant worry over Bishop and the tensions with Viola affected his most recent job as a dishwasher, which he had held for two years. *Id.* at 38–39, 41 (Tr. at 34–35, 37). Coleman first cut down his hours to two days a week. In 2009 when things became "overwhelming" and he "couldn't handle it anymore," he quit. *Id.* at 38, 41, 207 (Tr. at 34, 37, 203).

Coleman then applied for disability insurance benefits and supplemental security income. *Id.* at 162–64, 167–68 (Tr. at 158–60, 163–64). Administrative Law Judge (ALJ) Roger J. Reynolds denied his application, and the Appeals Council declined review. *Id.* at 5–23 (Tr. at 1–19). At that point, the denial became the final decision of the Commissioner. Coleman then appealed. R. 1.

## THE ALJ'S DECISION

ALJ Reynolds applied the traditional five-step analysis for Social Security decisions, *see Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010); 20 C.F.R. § 404.1520, and found as follows. First, Coleman was not employed. R. 9-1 at 15 (Tr. at 11). Second, Coleman had "borderline intellectual functioning; schizoaffective disorder versus major depressive disorder; post-traumatic stress disorder; and alcohol dependence, in remission by history," which qualified as severe impairments. *Id.* Third, none of Coleman's impairments qualified as one of the disabilities listed in 20 C.F.R. Pt. 404, Subpt. B, App'x 1. *Id.* at 16–19 (Tr. at 12–15). Fourth, Coleman could perform jobs that consist of only simple, routine tasks; did not require Coleman to act independently; and require minimal interactions with coworkers, supervisors, and the public. One example of a job Coleman could perform was his past job as a dishwasher. *See id.* at 19–21 (Tr. at 15–17). Finally, Coleman could also perform other available jobs, such as kitchen helper, laborer, packer, or janitor. *Id.* at 19–22 (Tr. at 15–18).

## DISCUSSION

This Court reviews an ALJ's decision to determine whether substantial evidence supports the ALJ's conclusions. Substantial evidence is proof that "a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted). An ALJ decision supported by substantial evidence will be upheld "even if substantial evidence would support the opposite conclusion." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

Coleman argues that the ALJ decision must be reversed for two reasons. First, Coleman says ALJ Reynolds violated the treating physician rule when he discounted the medical opinion of Dr. Larson. And second, Coleman argues ALJ Reynolds mischaracterized the record when he determined that Coleman's testimony about his limitations was not credible.

I.   **The ALJ's Decision To Discount the Medical Opinions of Dr. Larson**

The Social Security Regulations set out a treating physician rule that governs how ALJs evaluate treating physician opinions about an applicant's impairments. A treating physician opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [consistent] with the other substantial evidence" must be given controlling weight. 20 C.F.R. § 404.1527(c)(2). When an ALJ does not give a treating physician's opinion controlling weight, he must do two things. First, he must provide "good reasons" for why the treating physician opinion does not deserve controlling weight. *Id.* Second, he must explain what weight, if any, the treating source's opinion does deserve. *See id.*; *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The relevant factors are the length, frequency, nature, and extent of the treatment relationship; the evidence supporting the opinion; the consistency of the opinion with the records as a whole; and the physician's specialization. 20 C.F.R. § 404.1527(c)(2)–(c)(6); *see also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

The ALJ discounted the mental residual functional capacity assessment of Dr. Stuart Larson, one of Coleman's treating physicians. At the fourth step of the decision, the ALJ determined that Coleman could work, so long as the job involved only simple, routine tasks,

occasional contact with co-workers and supervisors, and minimal contact with the public. R. 9-1 at 19 (Tr. at 15). In reaching this conclusion, the ALJ considered all of the medical evidence and "discount[ed]" a checklist prepared by Dr. Larson, who has been Coleman's psychiatrist since at least January of 2009. *See id.* at 20, 259–60 (Tr. at 16, 255–56). The checklist indicates that (among other things) Coleman's ability to deal with the public and interact with supervisors is "poor/none," meaning Coleman had "no useful ability to function in [these] area[s]." *Id.* at 369 (Tr. at 365). Dr. Larson also noted that if Coleman "is having auditory hallucinations, all bets are off" with respect to Coleman's ability to understand, remember, and carry out job instructions. *Id.* at 370 (Tr. at 366).

Coleman argues that the ALJ's decision to discount Dr. Larson's assessment violated the treating physician rule because the ALJ did not provide good reasons for that decision. Coleman is correct that the ALJ decision violated the treating physician rule, but he is wrong about why. While the ALJ provided good reasons for not assigning Dr. Larson's assessment controlling weight, he did not explain what weight the assessment did deserve.[1]

The ALJ gave two good reasons for not assigning controlling weight to Dr. Larson's mental residual functional capacity assessment. First, the ALJ noted that Dr. Larson's assessment was inconsistent with his own treatment notes. *Id.* at 20 (Tr. at 16). Dr. Larson's treatment notes state that once Coleman started on a new medication his auditory hallucinations went "down to a whisper" and that "for the most part he can ignore them." *Id.*

---

[1] Coleman also argues in passing that the ALJ violated the treating physician rule by not assigning controlling weight to the medical opinion of Dr. Harwell Smith. *See* R. 11-1 at 12. Dr. Smith met with Coleman once to conduct a consultative examination on behalf of the Social Security Administration. *See* R. 9-1 at 16, 302–07 (Tr. at 12, 298–303). The ALJ did not violate the treating physician rule with respect to Dr. Smith because, as the name implies, the rule applies to treating, not examining, physicians. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x. 435, 442 (6th Cir. 2010).

at 366 (Tr. at 362). Coleman then switched to a different medication, which led to "a reduction in the auditory hallucinations." *Id.* at 362 (Tr. at 358). Coleman blamed his problems at work on his auditory hallucinations. *See id.* at 52–53 (Tr. at 48–49). Dr. Larson's assessment that Coleman was completely unable to work was therefore inconsistent with the significant reduction in auditory hallucinations described in Dr. Larson's treatment notes. Coleman argues that there is no inconsistency because the improvement occurred while he was not working. R. 11-1 at 11. But that argument cuts both ways. If Dr. Larson had no experience treating Coleman while he was employed, then it is not clear what the basis is for his assessment of Coleman's ability to perform work. Indeed, it appears that Dr. Larson based his assessment on Coleman's statements that he experiences "significant stress in dealing with others," rather than on anything in the treatment records. R. 9-1 at 370 (Tr. at 366).

Second, the ALJ pointed out that Dr. Larson's assessment was inconsistent with Coleman's own description of his church activities. *Id.* at 20 (Tr. at 16). Coleman testified that he was a lay minister. Coleman's position involved giving sermons, teaching Sunday school, visiting people, and working in the community under the direction of the pastor. *Id.* at 49–50 (Tr. at 45–46). Coleman argues that the ALJ mischaracterized his testimony because he no longer performs many of his lay minister duties. R. 11-1 at 13–14. The implication is that Coleman stopped after his schizophrenia and post-traumatic stress disorder intensified. But Coleman testified that he stopped visiting others because he did not want to leave his wife and child at home. And he stopped teaching Sunday school because the students grew up and his services weren't needed. R. 9-1 at 50 (Tr. at 46). He later

6

added that he had trouble remembering the sermons, that he would fall asleep at the pulpit, and that he shook hands with but avoided speaking with members of the church. *Id.* at 60–61 (Tr. at 56–57). Even accepting those limitations, Coleman's ability to perform his lay minister duties is inconsistent with the conclusion that Coleman has *no* ability to interact with supervisors or the public. Many people are ill-suited to take on the speaking duties and public role that ministering requires, but that does not mean they are unable to assume a more low-key role in the workplace. Thus the ALJ provided two good reasons for not assigning Dr. Larson's assessment controlling weight.

After declining to give Dr. Larson's assessment controlling weight, the ALJ failed to weigh the relevant factors and explain what weight, if any, the assessment did deserve. The ALJ simply states that he "discount[ed]" Dr. Larson's assessment. *Id.* at 20 (Tr. at 16). But he did not explain the extent to which he discounted the assessment. Even when a treating physician's opinion does not deserve controlling weight, the opinion is still "entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 . . . ." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4). This case provides a clear example of why the rule is helpful. Coleman's brief wavers between describing the ALJ's error as completely rejecting Dr. Larson's assessment and as assigning Dr. Larson's assessment too little weight. *See* R. 11-1 at 10, 12. This Court cannot decide which description is correct (much less assess whether the ALJ erred) because the ALJ does not mention the weight given to Dr. Larson's assessment at all. The treating physician rule is clear: An ALJ must "balance[e] the factors to determine what weight to give a treating source opinion denied controlling weight . . .

[and] give good reasons for the weight actually assigned." *Cole*, 661 F.3d at 938. The ALJ did neither, so the decision violated the treating physician rule.

When the treating physician rule is violated, the district court must remand the case back to the ALJ unless the error was harmless. *See id.* at 940–41 (explaining that a violation of the treating physician rule "denotes a lack of substantial evidence" (quoting *Blakley*, 581 F.3d at 407)). The clarity and reason-giving requirements embedded in the treating physician rule serve two purposes. First, they ensure that the reviewing court will be able to understand the ALJ's reasoning when reviewing the decision. Second, they ensure that the claimant will understand the decision in his case. *See Rogers*, 486 F.3d at 242–43. The rule "creat[es] an important procedural safeguard for claimants for disability benefits." *Wilson*, 378 F.3d at 547. For that reason violations of the rule require a remand unless the violation was harmless. *See Cole*, 661 F.3d at 939–40. The ALJ's decision does not fall within any of the three limited cases where a reviewing court may find harmless error. *See id.* at 940 (noting that a violation of the rule may be harmless if the treating physician's opinion is obviously wrong, if the ALJ agreed with the treating physician's conclusion, or if the ALJ complied with the spirit, but not the letter, of the rule). First, Dr. Larson's assessment is not patently deficient, as most of the conclusions match up with the ALJ's ultimate ruling on Coleman's capacity to work. Second, the ALJ did not reach the same conclusion as Dr. Larson. And third, the ALJ's decision does not serve the purposes of the treating physician rule in spite of the violation. Coleman and this Court do not know what weight the ALJ gave Dr. Larson's assessment because the ALJ's opinion does not reference or explain that weight.

Because the ALJ violated the treating physician rule by failing to state or explain the weight given to Dr. Larson's assessment and the violation is not harmless, a remand is required. *See Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553–54 (6th Cir. 2011) (explaining that reviewing courts do "not hesitate to remand" in the face of a violation of the treating physician rule) (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)). The decision to remand is not a signal that the ALJ should have assigned Dr. Larson's opinion a certain amount of weight or that the ALJ's ultimate decision to deny benefits was incorrect. It is simply a requirement that the ALJ follow the treating physician rule.

## II.     The ALJ's Decision That Coleman Was Not Fully Credible

The ALJ rejected Coleman's testimony about the "intensity, persistence, and limiting effects" of his mental symptoms as less than credible to the extent it conflicted with ALJ's residual functional capacity assessment. R. 9-1 at 20 (Tr. at 16). The decision does not explain the credibility determination. *See Rogers*, 486 F.3d 234 at 249 (finding that an ALJ decision was not supported by substantial evidence because it failed to state the reasons for the credibility determination and make clear what weight the applicant's testimony did deserve). This Court might be able to assemble an explanation from the record. *See Ulman*, 693 F.3d at 714 ("[H]armless error analysis applies to credibility determinations in the social security disability context."). But in light of the remand, this Court will not address the credibility issue. The ALJ is in a better position to do so on remand for the same that reason reviewing courts generally defer to ALJ credibility determinations: The ALJ "observ[es] a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

## CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1)   The plaintiff's motion for summary judgment, R. 11, is **GRANTED IN PART** and **DENIED IN PART**.

(2)   The defendant's motion for summary judgment, R. 12, is **DENIED**.

(3)   Pursuant to 42 U.S.C. § 405(g), this matter is **REMANDED** to the Commissioner for further administrative proceedings consistent with this Memorandum Opinion and Order.

This the 16th day of January, 2013.

Signed By:
*Amul R. Thapar*  AT
United States District Judge